Kyle McLean, Esq. (SBN #330580)
Email: kmclean@sirillp.com
Mason Barney, Esq. (*To Be Admitted Pro Hac Vice*)
Email: mbarney@sirillp.com
Tyler Bean, Esq. (*To Be Admitted Pro Hac Vice*)
Email: tbean@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Telephone: 213-376-3739

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **AMBER WILSON**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**HATCH BANK,**<br><br>Defendant. | Case No. **'23CV813  BEN DDL**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Amber Wilson, individually and on behalf of all similarly situated persons, alleges the following against Hatch Bank ("Hatch" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I.      INTRODUCTION

1.      Plaintiff brings this class action against Hatch Bank for its failure to properly secure and safeguard her and roughly 140,000 similarly situated

1

individuals' names and Social Security numbers (the "Private Information") from hackers.

2.    Hatch Bank, based in San Marcos, California, is a digital bank that serves financial technology, small businesses, financial companies, and individuals.[1]

3.    On or about February 28, 2023, Hatch filed with Attorneys General of various states, including Maine, Massachusetts, New York, Rhode Island, New Mexico, North Carolina, South Carolina, and the District of Columbia. Around this same time, Hatch also sent out data breach letters to individuals whose Private Informaion was compromised as a result of the hacking incident.

4.    Based on the Notice, Hatch "was notified [] of the incident [on February 3, 2023] and learned that its files contained on Fortra's GoAnywhere site were subject to unauthorized access."[2]

5.    In response, Hatch is providing affected consumers with access to up to twenty-four (24) months of credit monitoring and identity protection services.

6.    The Hatch investigation revealed that an unauthorized party had access to certain company files between January 30, 2023 and January 31, 2023 (the "Data Breach").

7.    Plaintiff and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

8.    The Private Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves, including but not limited to, names and Social Security numbers, that Hatch collected and maintained without adequate data security monitoring practices, procedures, and protocols in

---

[1] *See* https://hatchbank.com/ (last visited on April 29, 2023).
[2] *See* "Hatch Bank discloses breach after GoAnywhere MFT hack,"
https://www.bleepingcomputer.com/news/security/hatch-bank-discloses-data-breach-after-goanywhere-mft-hack/
(last visited on April 29, 2023).

place. Now armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, obtaining government benefits, filing fraudulent tax returns, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9.      There has been no assurance offered by Hatch that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

10.      Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.      Plaintiff brings this class action lawsuit to address Hatch's inadequate safeguarding and supervision of Class Members' Private Information that it collected and maintained, and its failure to timely detect the Data Breach.

12.      The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Hatch, and thus Hatch was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

13.      Upon information and belief, the vulnerability in Defendant's internal file transfer system was discovered by Defendant on or before January 29, 2023.[3]

---

[3] *See*  (last visited on May 3, 2023).

Thus, Defendant could have prevented the Data Breach by early detection of the hack, yet Defendants' business associate had to inform Defendants of the Data Breach at a later date following the compromise and exfiltration of Plaintiffs' and Class Members' Private Information.

14. Hatch and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Hatch properly monitored its networks and provided adequate supervision over its agents, vendors, and/or suppliers, it would have discovered the system vulnerability at issue sooner and prevented the Data Breach.

15. Hatch also could have prevented the theft had it limited the client information it shared with its vendors and employed reasonable supervisory measures to ensure that adequate data security practices, procedures, and protocols were being implemented and maintained by said vendors in order to secure and protect Defendant's clients' data.

16. Plaintiff's and Class Members' identities are now at risk because of Hatch's negligent conduct as the Private Information that Hatch collected and maintained is now in the hands of data thieves and other unauthorized third-parties.

17. Plaintiff seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

18. Accordingly, Plaintiff, on behalf of themselves and the Class, assert claims for negligence, breach of contract, breach of implied contract, invasion of privacy, violation of California's Unfair Competition Law, unjust enrichment, and declaratory and injunctive relief.

## II.    PARTIES

19.    Plaintiff Amber Wilson is, and at all times mentioned herein was, a citizen of the State of Connecticut.

20.    Defendant Hatch Bank is a digital bank incorporated in California with its principal place of business at 1001 West San Marcos Boulevard, Suite 125, San Marcos, CA 92078 in San Diego County.

## III.    JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is roughly 140,000, many of whom have different citizenship from Hatch. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

22.    This Court has jurisdiction over Hatch because Hatch operates in and/or is incorporated in this District.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Hatch has harmed Class Members residing in this District.

## IV.    FACTUAL ALLEGATIONS

### A. Hatch's Business and Collection of Plaintiff's and Class Members' Private Information

24.    Hatch is a digital bank that provides online banking services to fintechs, financial institutions, small businesses, and individual consumers. Founded in 1981, Hatch "build[s] products for digital first consumers and businesses through key relationships with fintech companies."[4]

---

[4] *See* https://hatchbank.com/ (last visited on April 29, 2023).

25.     Hatch is a wholly owned subsidiary of Firstrust Bank, employs more than 25 people, and generates approximately $5 million in annual revenue.

26.     As a condition of receiving digital banking services, Hatch  required that Plaintiff entrust it with her highly sensitive personal information. In the ordinary course of receiving services from Hatch, Plaintiff was required to provide her Private Information to Defendant.

27.     In its "Privacy Notice," Hatch promises its customers that it will not share this Private Information with third parties except to engage in "everyday business purposes—such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus."[5] Hatch adds that it may also share its customers' personal information for marketing purposes, its affiliates' everyday business purposes, and for its affiliates and nonaffiliates "to market to you."[6]

28.     Thus, Hatch promises consumers that it will keep their Private Information private; comply with industry standards related to data security and the maintenance of their Private Information; inform them of its legal duties relating to data security and comply with all federal and state laws protecting their Private Information; only use and release their Private Information for reasons that relate to the services it provides; and provide adequate notice to them if their Private Information is disclosed without authorization.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Hatch assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

---

[5] Privacy Notice, https://hatchbank.com/wp-content/uploads/2019/10/00-PL-40-Privacy-Notice-201906.pdf (last visited on April 29, 2023).
[6] *Id*.

30.    Plaintiff and Class Members relied on Hatch to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B. <u>The Data Breach</u>**

31.    Upon information and belief, a vulnerability in Hatch's internal file transfer system was first discovered by the company on January 29, 2023.[7]

32.    Hatch failed to detect the breach and, on February 3, 2023, its vendor had to inform it of the Data Breach.

33.    Through the Data Breach, which was carried out by the notorious Clop ransomware gang, the unauthorized cybercriminals were able to access a cache of highly sensitive Private Information, including Plaintiff's and Class Members' names and Social Security numbers.

34.    Upon information and belief, Clop knew of Hatch's system vulnerability prior to January 29, 2023 and had been exploiting it before it was discovered by Hatch or the agents, contractors, vendors, and suppliers Hatch supervised.[8]

35.    Hatch had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

36.    Plaintiff and Class Members provided their Private Information to Hatch with the reasonable expectation and mutual understanding that Hatch would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

---

[7] *See* https://techcrunch.com/2023/03/02/hatch-bank-breach-fortra-goanywhere-exploit/#:~:text=Hatch%20Bank%2C%20a%20digital%2Dfirst,of%20customer% (last visited on April 29, 2023).
[8] *See* https://www.cpomagazine.com/cyber-security/clop-ransomware-breaches-130-organizations-steals-1-million-chs-healthcare-patients-records/ (last visited on April 29, 2023).

37.    Hatch's data security obligations were particularly important given the substantial increase in cyberattacks on financial institutions in recent years.

38.    Hatch knew or should have known that its electronic records would be targeted by cybercriminals. However, it failed to adequately monitor its agents, contractors, vendors, and suppliers in the handling and securing of Plaintiff's and Class Members' Private Informaiton and thus failed to maintain reasonable security safeguards and protocols to protect the Class's Private Information, rendering them easy targets for cybercriminals.

## C. Hatch Failed to Comply with FTC Guidelines

39.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decisionmaking. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

40.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts

of data being transmitted from the system, and have a response plan ready in the event of a breach.

41.    The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

42.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

43.    As evidenced by the Data Breach, Hatch failed to properly implement basic data security practices. Hatch's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

44.    Hatch was at all times fully aware of its obligation to protect the Private Information of its customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**D. Hatch Failed to Comply with Industry Standards**

45.    As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

46.    Some general industry best practices that should be implemented by businesses like Defendants include but are not limited to: educating all employees, using only strong password requirements, implementing multilayer security including firewalls, anti-virus and anti-malware software, using encryption, requiring multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

47.    Some industry best practices that should be implemented by businesses like Hatch include but are not limited to: educating and monitoring all employees, agents, and vendors regarding adequate data security practices, implementing strong password requirements, implementing multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and adequately monitoring employees, agents, vendors and others who may have access to highly sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

48.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**E. Hatch Failed to Comply With Federal Law Concerning the Protection of Financial Institution Customers' Personal Information**

49.    Section 501(b) of the Gramm-Leach-Bliley Act states in relevant part that bank regulators must establish regulations, which banks must comply with, that "insure the security and confidentiality of customer records and information," "protect against any anticipated threats or hazards to the security or integrity of such records," and "protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any

customer."[9]  The regulation's provisions became effective in July 2001 and have steered the discussion of customer information protection in banking ever since. Nevertheless, as the Data Breach demonstrates, Defendant failed to live up to these cybersecurity obligations.

50.   The Federal Deposit Insurance Corporation ("FDIC") guidance to banks regarding unauthorized access to customer information defines "sensitive customer information" to mean "a customer's name, address or telephone number in conjunction with the customer's Social Security number, driver's license number, account number, credit or debit card number, or a personal identification number or password that would permit access to the customer's account."[10]

51.   Here Defendant told the Maine Attorney General and other Attorneys General that the Breach concerned its customers' names and Social Security numbers.  As such, there is no question that the data involved here is what the FDIC would term sensitive customer information.

52.   The FDIC guidance further requires banks to notify its customers of a data breach "whenever it becomes aware of an incident of unauthorized access to customer information and, at the conclusion of a reasonable investigation, determines that misuse of the information has occurred or it is reasonably possible that misuse will occur."[11]  In interpreting this guidance, banking industry groups recommend that banks provide notice to their customers "as soon as possible."[12]

---

[9] *See also* FDIC Financial Institution Letter FIL-68-2001 *available at* https://www.fdic.gov/news/inactive-financial-institution-letters/2001/fil0168a.html (last visited May 1, 2023).
[10] FIL-27-2005 (April 1., 2005) *available at* https://www.fdic.gov/news/financial-institution-letters/2005/fil2705.html (last visited May 1, 2023).
[11] *Id.*
[12] American Bankers Association, Data Security & Customer Notification Requirements for Banks, *available at* https://www.aba.com/banking-topics/technology/data-security/data-security-customer-notification.

53.    Hatch knew at least by late January or early February that its data was on the dark web, and thus knew that misuse of the stolen information had occurred. For these reasons, Hatch appears to have notified its customers as soon as it could.

54.    In addition, federal regulations require banks to closely oversee security of third party vendors. Given the circumstances of the instant Data Breach, it is apparent that Defendant also failed to fulfill this requirement.

## F. Hatch Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information

55.    In addition to its obligations under federal and state laws, Hatch owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Hatch owed a duty to Plaintiff and Class Members to provide reasonable security, including complying with industry standards and requirements, adequate monitoring of its employees, agents, and vendors, and ensuring that its computer systems, networks, and protocols (as well as those of its vendors) adequately protected the Private Information of Class Members.

56.    Hatch breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly monitor, maintain and safeguard its Plaintiff's and Class Members' Private Information. Hatch's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.    Failing to adequately protect customers' Private Information;

   b.    Failing to sufficiently monitor its employees, agents, and vendors regarding the proper handling of its customers' Private Information;

   c.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

d. Failing to adhere to industry standards for cybersecurity as discussed above; and

e. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

57.  Hatch negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to exploit a vulnerability in its internal file transfer system.

58.  Had Hatch remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

59.  Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Hatch.

## G. Hatch Should Have Known that Cybercriminals Target Private Information to Carry Out Fraud and Identity Theft

60.  The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[13] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep

---

[13] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on April 29, 2023).

employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

61.    Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why cybercriminals like the Clop ransomware gang steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

62.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

63.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

64. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

65. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[14] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

66. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

67. PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison

---

[14] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited April 29, 2023).

sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

68.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[15] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

69.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[16] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[17]

70.    Likewise, the value of PII is increasingly evident in our digital economy. Many companies including Hatch collect PII for purposes of data analytics and marketing, as acknowledged in its Privacy Notice. These companies collect it to better target customers, and share it with third parties for similar purposes.[18]

---

[15] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited on April 29, 2023).

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited on April 29, 2023).

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on April 29, 2023).
[18] *See* https://robinhood.com/us/en/support/articles/privacy-policy/ (last visited on April 29, 2023).

71.     One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[19]

72.     Consumers also recognize the value of their personal information, and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather in the economic benefit consumers derive from being able to use it and control the use of it.

73.     A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

74.     Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs their ability to participate in the economic marketplace.

---

[19] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

75.    A study by the Identity Theft Resource Center[20] shows the multitude of harms caused by fraudulent use of PII:



76.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[21]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[20] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited April 29, 2023).

[21] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited April 29, 2023).

77.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

78.    As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years.

**H. Plaintiff's and Class Members' Damages**

79.    Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

80.    Plaintiff Wilson began banking with Defendant in the year 2020. In order to receive banking services from Defendant, she had to disclose her Private Information to Defendant.

81.    Since the Data Breach, she has received numerous phishing messages through text and email from payday loan servicers. She has placed fraud alerts on her accounts and is now forced to spend more time than ever before monitoring her accounts for fraudulent activity.

82.    Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

83.    Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

84.    As a direct and proximate result of Hatch's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

85.     Further, as a direct and proximate result of Hatch's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

86.     Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

87.     The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

88.     Plaintiff suffered actual injury from the exposure of her PII, which violates her right to privacy.

89.     Plaintiff has and will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

90.     Plaintiff and Class Members also suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property – property that defendant was required to adequately protect.

91.     Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Hatch, is protected from future additional breaches by the implementation of more adequate

data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

92.    As a direct and proximate result of Hatch's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    CLASS ACTION ALLEGATIONS

93.    Plaintiff brings this action individually and on behalf of all other persons similar situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

94.    Specifically, Plaintiff proposes the following Nationwide Class, as well as the following State Subclass definitions (also collectively referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

**All individuals in the United States who had Private Information compromised as a result of the Data Breach, including all who were sent a notice of the Data Breach.**

95.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

96.    Plaintiff reserves the right to modify or amend the definitions of the proposed Nationwide Class, as well as add subclasses, before the Court determines whether certification is appropriate.

97.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

98.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of 139,493 customers of Hatch whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Hatch's records, Class Members' records, publication notice, self-identification, and other means.

99.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Hatch engaged in the conduct alleged herein;

b.    Whether Hatch's conduct violated California's Unfair Competition Law invoked below;

c.    When Hatch actually learned of the system vulnerability and resulting Data Breach;

d.    Whether Hatch's response to the Data Breach was adequate;

e.    Whether Hatch unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f.    Whether Hatch failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.  Whether Hatch's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Hatch's data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Hatch owed a duty to Class Members to safeguard their Private Information;

j.  Whether Hatch breached its duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether Hatch knew or should have known that its data security systems and monitoring processes were deficient;

m.  What damages Plaintiff and Class Members suffered as a result of Hatch's misconduct;

n.  Whether Hatch's conduct was negligent;

o.  Whether Hatch's conduct was *per se* negligent;

p.  Whether Hatch was unjustly enriched;

q.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

r.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

100.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

101.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

102.  <u>Predominance</u>. Hatch has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Hatch's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

103.  <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Hatch. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

104.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Hatch has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

105.    Finally, all members of the proposed Class are readily ascertainable. Hatch has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Hatch.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

106.    Plaintiff restates and realleges all of the allegations stated in paragraphs 1-105 as if fully set forth herein.

107.    Hatch knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

108.    Hatch knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Hatch was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

109.    Hatch owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Hatch's duties included, but were not limited to, the following:

    a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, monitoring, deleting, and protecting the Private Information;

    b. To protect its customers' Private Information using reasonable and adequate security procedures, practices, and protocols compliant with industry standards;

    c. To have employee, agent, and vendor monitoring procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession; and

    d. To employ reasonable data security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA.

110. Hatch's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

111. Hatch's duty also arose because Defendant was bound by industry standards to protect its customers' confidential Private Information.

112. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Hatch owed them a duty of care to not subject them to an unreasonable risk of harm.

113. Hatch breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the Private Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injuries. Defendant further breached its duties by failing to timely detect the Data Breach,

which actually and proximately caused Plaintiff's and Class Members' injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress

114. Hatch had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Hatch with their Private Information was predicated on the understanding that Hatch would take adequate security precautions to protect it.

115. Hatch's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised, exfiltrated, and misused, as alleged herein.

116. Hatch's breaches of duties owed to Plaintiff and Class Members also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

117. As a result of Hatch's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

118. Hatch also had independent duties under federal and state law that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

119. As a direct and proximate result of Hatch's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

120.  The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

121.  Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

122.  In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Hatch to, *inter alia*, strengthen its data security systems and supervision procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

<u>**COUNT II**</u>
<u>**BREACH OF CONTRACT**</u>
<u>**(On behalf of Plaintiff and the Class)**</u>

123.  Plaintiff restates and realleges the allegations in paragraphs 1-105 as if fully set forth herein.

124.  Plaintiff and Class Members entered into a valid and enforceable contract through which they paid money to Hatch in exchange for banking services. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiff's and Class Members' Private Information to unauthorized third parties.

125.  Hatch's Privacy Policy memorialized the rights and obligations of Hatch and its customers. This document was provided to Plaintiff and Class Members in a manner in which it became part of the agreement for services.

126.  In the Privacy Policy, Hatch commits to protecting the privacy and security of private information and promises to never share Plaintiff's and Class Members' Private Information except under certain limited circumstances.

127.  Plaintiff and Class Members fully performed their obligations under their contracts with Hatch.

128.   However, Hatch did not secure, safeguard, and/or keep private Plaintiff's and Class Members' Private Information, and therefore Hatch breached its contracts with Plaintiff and Class Members.

129.   Hatch allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class Members' Private Information without permission. Therefore, Hatch breached the Privacy Policy with Plaintiff and Class Members.

130.   Hatch's failure to satisfy its confidentiality and privacy obligations resulted in Hatch providing services to Plaintiff and Class Members that were of a diminished value.

131.   As a result, Plaintiff and Class Members have been harmed, damaged, and/or injured as described herein, including in Defendant's failure to fully perform its part of the bargain with Plaintiff and Class Members.

132.   As a direct and proximate result of Hatch's conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

133.   In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Hatch to, *inter alia*, strengthen its data security systems and supervision procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT III
### BREAK OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

134.   Plaintiff restates and realleges the allegations in paragraphs 1-105 as if fully set forth herein.

135.   This Count is pleaded in the alternative to Count II above.

136.    Hatch provides digital banking services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members providing their Private Information to Defendant in exchange for services from Defendant.

137.    Through Defendant's provision of services to Plaintiff and Class Members, it knew or should have known that it was obligated to protect Plaintiff's and Class Members' confidential Private Information in accordance with Hatch's policies, practices, and applicable law.

138.    As consideration, Plaintiff and Class Members turned over valuable Private Information to Hatch. Accordingly, Plaintiff and Class Members bargained with Hatch to securely maintain and store their Private Information.

139.    Hatch accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

140.    In delivering their Private Information to Hatch, Plaintiff and Class Members intended and understood that Hatch would adequately safeguard it as part of that service.

141.    Defendant's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees, agents, vendors, and/or suppliers is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees, agents, vendors, and/or suppliers; (4) designing and implementing appropriate supervision policies, practices, and procedures to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption of the Private

Information; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

142.   Plaintiff and Class Members would not have entrusted their Private Information to Hatch in the absence of such an implied contract.

143.   Had Hatch disclosed to Plaintiff and the Class that they did not have adequate security practices to secure sensitive data, Plaintiff and Class Members would not have banked with Hatch and thus would not have provided Hatch with their Private Information.

144.   Hatch recognized that Plaintiff's and Class Member's Private Information was highly sensitive and must be protected, and that this protection was of material importance as part its bargain with Plaintiff and the other Class Members.

145.   Hatch violated these implied contracts by failing to employ reasonable and adequate security measures to ensure the security of Plaintiff's and Class Members' Private Information.

146.   Plaintiff and Class Members have been damaged by Hatch's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT IV**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE § 17200, *ET SEQ*.**
**(On behalf of Plaintiff and the Class)**

147.   Plaintiff restates and realleges the allegations in paragraphs 1-105 as if fully set forth herein.

148.   The California Unfair Competition Law provides that:

"[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section

17500) of Part 3 of Division 7 of the Business and Professions Code." (BUS. & PROF. CODE § 17200.)

149.   Defendant stored the Private Information of Plaintiff and the Class in its computer systems and knew or should have known it did not employ reasonable, industry standard and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the Class's Private Information secure and prevented the loss or misuse of such.

150.   Defendant failed to disclose to Plaintiff and the Class that their Private Information was not secure. At no time were Plaintiff and the Class on notice that their Private Information was not secure, which Defendant had a duty to disclose.

151.   Had Defendant complied with these requirements, Plaintiff and the Class would not have suffered the damages related to the data breach.

152.   Defendant's conduct was unlawful, in that it violated the policy set forth in California's Consumer Records Act, requiring the safeguard of personal information like Social Security numbers, the FTCA, as identified above, and Defendant's common law duty to safeguard PII.

153.   Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

154.   Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.,* Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the

Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

155.    As a result of those unlawful and unfair business practices, Plaintiff and the Class suffered an injury-in-fact and have lost money or property.

156.    The injuries to Plaintiff and the Class greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

157.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

158.    Therefore, Plaintiff and the Class are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

## COUNT V
## INVASION OF PRIVACY
### (On behalf of Plaintiff and the Class)

159.    Plaintiff restates and realleges the allegations in paragraphs 1-105 as if fully set forth herein.

160.    Plaintiff and Class Members maintain a privacy interest in their Private Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above.

161.    Additionally, Plaintiff's and Class Members' Private Information is highly attractive to criminals who can nefariously use such Private Information for fraud, identity theft, and other crimes without the victims' knowledge and consent.

162.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiff's and the Class's Private Information is highly offensive to a

reasonable person. Defendant's reckless and negligent failure to protect Plaintiff's and the Class's Private Information constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

163.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

164.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

165.    Thus, Plaintiff's seek injunctive relief requiring Hatch to, *inter alia*, strengthen its data security systems and supervision procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

166.    Plaintiff and Class Members also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

167.    Plaintiff restate and reallege the allegations in paragraphs 1-105 as if fully set forth herein.

168.    This Count is pleaded in the alternative to Counts II and III above.

169.    Plaintiff and Class Members conferred a benefit on Hatch by turning over their Private Information to Defendant in exchange for cybersecurity protection

sufficient to protect their Private Information. Plaintiff and Class Members did not receive such protection.

170.   Upon information and belief, Hatch funds its data security measures entirely from its general revenue, which includes revenue from marketing Plaintiff's and Class Members' Private Information, as set forth in Defendant's Privacy Notice.

171.   As such, a portion of such revenue is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of its revenue that is allocated to data security is known to Hatch.

172.   Hatch has retained the benefits of its unlawful conduct, including the amounts of revenue received from the use of Plaintiff's and Class Members' Private Information that should have been used for adequate cybersecurity practices that it did failed to provide.

173.   Hatch knew that Plaintiff and Class Members conferred a benefit upon it, which Hatch accepted. Hatch used the Private Information of Plaintiff and Class Members for business purposes and profited therefrom, while failing to use such revenue for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

174.   If Plaintiff and Class Members had known that Hatch would not adequately secure their Private Information, they would not have agreed to provide their Private Information to Defendant.

175.   Due to Hatch's conduct alleged herein, it would be unjust and inequitable under the circumstances for Hatch to be permitted to retain the benefit of its wrongful conduct.

176.   As a direct and proximate result of Hatch's conduct, Plaintiff and Class Members have suffered and/or are at a substantial and imminent risk of suffering injury, including but not limited to: (i) actual identity theft; (ii) the loss of the

opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Hatch's possession and is subject to further unauthorized disclosures so long as Hatch fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

177.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Hatch and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Hatch from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

178.    Plaintiff and Class Members may not have an adequate remedy at law against Hatch, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VII
## DECLARATORY JUDGMENT
### (On behalf of Plaintiff and the Class)

179.    Plaintiff restate and reallege the allegations in paragraphs 1-105 as if fully set forth herein.

180.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state laws and regulations described in this Complaint.

181.   Hatch owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

182.   Hatch still possesses Private Information regarding Plaintiff and Class Members.

183.   Plaintiff alleges that Hatch's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

184.   Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a. Hatch owes a legal duty to secure its customers' Private Information and to timely notify customers of a data breach under the common law and Section 5 of the FTCA;

   b. Hatch's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect customers' Private Information; and

   c. Hatch continues to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

185.   This Court should also issue corresponding prospective injunctive relief requiring Hatch to employ adequate security protocols consistent with legal and

industry standards to protect customers' Private Information, including the following:

    a.  Order Hatch to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

    b.  Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Hatch must implement and maintain reasonable security measures, including, but not limited to:

        i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Hatch's systems on a periodic basis, and ordering Hatch to promptly correct any problems or issues detected by such third-party security auditors;

        ii.  engaging third-party security auditors and internal personnel to run automated security monitoring;

        iii.  auditing, testing, and training its security personnel regarding any new or modified procedures;

        iv.  segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Hatch's systems;

        v.  conducting regular database scanning and security checks;

        vi.  routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.       meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps Hatch's customers should take to protect themselves.

186.   If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Hatch. The risk of another such breach is real, immediate, and substantial. If another breach at Hatch occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

187.   The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Hatch if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Hatch's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Hatch has a pre-existing legal obligation to employ such measures.

188.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Hatch, thus preventing future injury to Plaintiff and other customers whose Private Information would be further compromised.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory

damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing Hatch to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e.  An order requiring Hatch to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all triable issues.

DATED:  May 4, 2023                    Respectfully submitted,


                                       */s/Kyle McLean*
                                       Kyle McLean, Esq. (SBN #330580)
                                       Email: kmclean@sirillp.com
                                       Mason Barney, Esq.
                                       (*To Be Admitted Pro Hac Vice*)
                                       Email: mbarney@sirillp.com
                                       Tyler Bean, Esq.
                                       (*To Be Admitted Pro Hac Vice*)
                                       Email: tbean@sirillp.com
                                       **SIRI & GLIMSTAD LLP**
                                       700 S. Flower Street, Ste. 1000

Los Angeles, CA 90017
Telephone: 213-376-3739

*Attorneys for Plaintiff*