1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                     SOUTHERN DISTRICT OF CALIFORNIA
10

11  | AMBER WILSON, individually and on | Case No.: 23cv813-JES (MPP)
    | behalf of all others similarly situated, |
12  |                                    | **ORDER:**
    |                        Plaintiff, |
13  |                                    |
    | v.                                 | **(1) GRANTING DEFENDANT'S**
14  |                                    | **MOTION TO COMPEL**
    | HATCH BANK,                        | **ARBITRATION; and**
15  |                                    |
    |                        Defendant. | **(2) DISMISSING CASE WITHOUT**
16  |                                    | **PREJUDICE**
17  |                                    |
    |                                    | **[ECF No. 7]**
18

19        Pending before the Court is Defendant Hatch Bank's ("Defendant") Motion to
20  Compel Arbitration and Dismiss the Complaint. ECF No. 7, "Mot.". Plaintiff Amber
21  Wilson ("Plaintiff") has filed a response in opposition to the Motion, ECF No. 9,
22  "Opp'n", and Defendant has filed a reply. ECF No. 11, "Reply". After a thorough review
23  of the record and the relevant case law, and for the reasons set forth below, the Court
24  **GRANTS** Hatch Bank's Motion to Compel Arbitration and **DISMISSES** the case
25  without prejudice.
26  ////
27  ////
28

## I.       BACKGROUND

On January 20, 2023, Wilson applied for a loan from Hatch Bank, a digital bank that serves financial technology, small businesses, financial companies, and individuals. *See* ECF No. 1, "Complaint" ¶ 2; *see also* ECF No. 7-2, "Gu Dec." ¶ 6. Wilson submitted her loan application through an online loan portal hosted by Wisetack, Inc. ("Wisetack"), Defendant's program manager and servicer. *See* Gu Dec. ¶¶ 4, 6. Wisetack provides consumer credit technology solutions, marketing, and servicing for consumer loans originated by lenders such as Hatch Bank, as well as a platform through which consumers can submit applications to and obtain loan financing. *See id.* ¶ 4. To receive applicant data from Wisetack, Hatch Bank utilizes a third-party hosted file transfer site, GoAnywhere, which is owned and operated by a third party, Fortra. *Id.* ¶ 7. To submit her application, Wilson was required to assent to Wisetack's General Terms of Service ("TOS"), E-Sign Consent, and Privacy Policy (collectively, "The Agreements"), by selecting a "click box" which read, "I agree" and was presented with links from which she could view The Agreements. *See Id.* ¶¶ 9-10. Wilson did not ultimately obtain a loan or any other financial product from Hatch Bank. *See Id.* ¶ 8.

Between January 30, 2023, and January 31, 2023, Hatch Bank's files, which included Wilson's personal identifiable information,[1] stored on Fortra's GoAnywhere site were subject to unauthorized access by cybercriminals. *See* Complaint ¶¶ 4, 6. Accordingly, Plaintiff brings this putative class action against Defendant asserting claims for (1) negligence; (2) breach of contract; (3) breach of implied contract; (4) invasion of privacy; (5) violation of California's Unfair Competition Law; (6) unjust enrichment; and (7) declaratory and injunctive relief. *See Id.* ¶ 18.

---

[1] Personal identifiable information (PII) is data that can be used to detect a specific individual. Such data can be used to apply for employment, lines of credit, and purchase or lease real property. *See* Complaint ¶¶ 66-67.

**AGREEMENT LANGUAGE**

The following clauses of Wisetack's TOS are related to the parties and pertinent to arbitration. The preamble of the TOS states:

> These General Terms of Service ("Terms") are a legally binding agreement between you ("you" or "User") and Wisetack, Inc., and our affiliates, agents, and assigns ("Wisetack," "we," or "us") regarding your use of Wisetack's services, including our platform, online services, and software applications (collectively, the "Service" or "Services"). Please read the Terms carefully. By using the Service you acknowledge that you have read, understood, and agree to be bound by the Terms, including the Wisetack Privacy Policy. These Terms provide that all disputes between you and Wisetack with respect to your use of the Service will be resolved by binding arbitration, to the fullest extent permitted under applicable law.

ECF No. 7-4 at 2. Section 1 of the TOS states:

> The Service is intended to provide consumer financing through third-party merchant websites, in-person transactions, software platforms, retail stores, or any other method that we or our partners make the Services available (collectively, "Merchants"), and through which individual persons ("Customers") may apply for a loan from Hatch Bank, the lender for Wisetack loans ("Hatch Bank"). Hatch Bank will pay the Merchant from whom a Customer has purchased goods or services in exchange for the Customer's promise to repay the loan used for such purchase plus a finance charge, as detailed herein.

*Id.* Section 19(a), the ("Arbitration Clause"), of the TOS states:

> In the interest of resolving disputes in the most expedient and cost-effective manner, you and Wisetack agree that every dispute arising in connection with these Terms or the Services will be resolved by binding arbitration, to the fullest extent permitted under applicable law. Arbitration is less formal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, may allow for more limited discovery than in court, and can be subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. This agreement to arbitrate disputes includes all claims arising out of or relating to any aspect of these Terms or the use of the Services, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and regardless of whether a claim arises during or after the termination of these Terms or any use of the Service. YOU

UNDERSTAND AND AGREE THAT, BY USING THE SERVICES, YOU AND WISETACK ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW.

*Id.* at 5. Finally, Section 19(c), the ("Delegation Clause"), of the TOS, states:

To the fullest extent permitted under applicable law, any arbitration related to these Terms or the Service will be settled under the Federal Arbitration Act, and governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by these Terms, and will be administered by the AAA.

*Id.*

## II.   LEGAL STANDARD

### A.   The Federal Arbitration Act

Agreements "evidencing a transaction involving commerce" are subject to the Federal Arbitration Act ("FAA"). *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citing 9 U.S.C. § 2). The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[A] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that ... arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. If the district court finds a party has failed to comply with a valid arbitration agreement, it must issue an order compelling arbitration. *Id.*

Under the FAA, the court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at 1130. "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* Courts must apply ordinary state law principles in determining whether to invalidate an agreement to arbitrate. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002). Accordingly, arbitration agreements may be

4

invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339-41 (2011).

"[P]arties cannot delegate issues of formation to the arbitrator." *Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021). However, "[i]t is well-established that some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability, can be delegated to an arbitrator by agreement." *Id.* at 634. "The presence of a delegation clause, limits the issues that a court may decide." *Caremark LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). "[A] valid—i.e., enforceable—delegation clause commits to the arbitrator nearly all challenges to an arbitration provision." *Id.* at 1029–30.

## III.  DISCUSSION

Applying the legal standards set forth above, the Court will determine the following: (1) whether Wilson and Wisetack entered into an agreement to arbitrate; (2) whether Hatch Bank, a non-signatory party, may enforce such an agreement; (3) whether questions of validity and arbitrability have been delegated to the arbitrator; and (4) if the agreement is valid and such questions have been delegated to the arbitrator, whether this action should be stayed or dismissed, or alternatively, if the agreement is not valid or those questions were not delegated, decide the issues.

### A.    Wilson and Wisetack Entered into an Agreement to Arbitrate

"To determine whether the parties formed an agreement to arbitrate, courts apply ordinary state-law principles that govern the formation of contracts.'" *Int'l Bhd. of Teamsters v. NASA Services, Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under California law, a contract can only be formed when the parties manifest their mutual assent to the terms of the agreement. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. Accordingly, the primary focus in determining the existence

of mutual consent is upon the acts of the parties involved." *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019) (citations omitted). "These elemental principles of contract formation apply with equal force to contracts formed online." *Berman*, 30 F.4th at 855–56. Therefore, when "a website offers contractual terms to those who use the site, and a user engages in conduct that manifests [their] acceptance of those terms, an enforceable agreement can be formed." *Id.* at 856.

Generally, contracts formed over the Internet fall within two categories: (1) "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use"; and (2) "'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). The Ninth Circuit has held:

> [A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman*, 30 F.4th at 856. The party seeking to compel arbitration has the burden to prove, by a preponderance of the evidence, that a contract to arbitrate exists. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413, (1996)).

Hatch Bank contends that Wisetack's TOS, which contains an agreement to arbitrate, is a clickwrap agreement. *See* Mot. at 13. Hatch Bank argues a valid and enforceable arbitration agreement exists between Wilson and Wisetack because to submit her loan application to Hatch Bank, Wilson was required to, and did, affirmatively assent to The Agreements by selecting the "I agree" click box. *See Id.* at 12-13.

Wilson argues the text of the click-box button itself did not indicate that it would bind Plaintiff to a set of terms and conditions. Thus, she did not take any action that

1  unambiguously manifested her assent to be bound by the terms of The Agreements. *See*

2  Opp'n at 16.

3       For context, the Court has provided a screenshot of the Wisetack landing page at

4  issue below:



24  ECF No. 7-3 at 1.

25  ////

26  ////

27  ////

28  ////

### 1.    Reasonably Conspicuous Notice

To satisfy the first part of the test outlined in *Berman*, "notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." 30 F.4th at 856.

The pertinent portion of Wisetack's loan application, displayed above, requests that the user provide their personal information and requires them to select the click-box, which states "I agree to the Terms of Service, E-Sign Consent, and Privacy Policy." *See id.* Such notice is conspicuous because the text is displayed in a font size such that a reasonably prudent Internet user could read it and understand, and based on the contrasting font colors of the text, realized that it contained links to the listed agreements that the user can then click on. Thus, the first part of the test is satisfied.

### 2.    Unambiguous Manifestation of Assent

"A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857 (citing *Specht v. Netscape Comm. Corp.*, 306 F.3d 17, 29–30 (9th Cir. 2002). "[N]otice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

Here, Wilson could not proceed to the subsequent step of the loan application process without selecting the click-box button. Therefore, Wilson acted voluntarily when she selected the click-box button, located adjacent to the previously referenced text, and the "Continue" button. Because the notice explicitly advises that selecting the box constitutes assent to the terms and conditions of listed agreements, the second part of the test is satisfied. *See In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019) ("Where it is clear that a party is assenting to a contract that incorporates other documents by reference, the incorporation is valid—and the terms of the incorporated document are binding—so long as the incorporation is 'clear and unequivocal, the reference [is] called to the attention of the other party and he [ ] consent[s] thereto, and the terms of the incorporated document

23cv813-JES (MPP)

[are] known or easily available to the contracting parties.'" (citations omitted)); *see also Adibzadeh v. Best Buy, Co. Inc.*, No. 20-CV-06257-JSW, 2021 WL 4440313, at *5 (N.D. Cal. Mar. 2, 2021) (finding a website where users must agree to the website's terms and conditions before they can proceed and in which the terms and conditions were conspicuous and available to Internet consumers via hyperlinks, offset in blue color text, provided the user with inquiry notice of the agreement's existence and contents and therefore assented when they clicked the "Sign In" button).

The Court concludes that Wilson and Wisetack entered into an agreement to arbitrate, and now turns to whether Defendant can enforce such an agreement as a non-signatory party.

**B.      Hatch Bank Can Enforce the Agreement to Arbitrate as a Non-Signatory Party**

"The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). Because Wisetack's TOS does not contain a choice-of-law provision, and neither party has asked the Court to apply any state law other than California, the Court applies California contract law to determine whether Hatch Bank can compel arbitration.[2] Generally, only a party to an arbitration agreement may enforce it. *DMS Services, Inc. v. Superior Court*, 205 Cal. App. 4th 1346, 1352 (2012). However, courts have recognized exceptions to the general rule, allowing non signatories to compel arbitration. *Suh v. Superior Court*, 181 Cal. App. 4th 1504, 1513 (2010). Two such exceptions include third-party beneficiary and equitable estoppel. *Id.*

////

---

[2] It should be noted that any language contained between Section 5(b) and Section 18 were not including in Exhibit B of Defendant's Motions. (*See generally* (ECF No. 7-4))

23cv813-JES (MPP)

### 1.   Third-Party Beneficiary

Under California law, a "contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. The third-party beneficiary is not required to be named in the contract if the agreement reflects the contracting parties' intent to benefit the unnamed party. *Sessions Payroll Mgmt., Inc. v. Noble Const. Co., Inc.*, 84 Cal.App.4th 671, 680 (2000). The California Supreme Court established a three-part test to ascertain whether a contract intends to benefit a third-party. *Goonewardene v. ADP, LLC*, 6 Cal.5th 817, 830 (2019). The *Goonewardene* test analyzes:

> (1) whether the third-party would in fact benefit from the contract; (2) whether a motivating purpose of the contract was to provide a benefit to the third-party; and (3) whether permitting a third-party to [enforce arbitration] against a contracting party is consistent with the objectives and reasonable expectations of the contract.

*Id.*

Hatch Bank argues it may compel arbitration as a third-party beneficiary because (1) it benefited from Wisetack's TOS by receiving: "a loan application from Plaintiff, a prospective borrower; Plaintiff's authorization for Hatch Bank to use her information to obtain her credit report; and direct assurances from Plaintiff regarding her use of the services and Hatch Bank's liability thereunder,"; (2) the motivating purpose for the TOS was to provide a benefit to Defendant because the very purpose of the TOS is to facilitate applications for a loan from Defendant; and (3) Defendant is mentioned by name in the TOS thirty-eight times, therefore, permitting Defendant to enforce Wisetack's TOS is consistent with the objectives of the contract and Plaintiff's reasonable expectations. Mot. at 7-8.

Plaintiff argues Defendant is not a third-party beneficiary of the TOS and, therefore, may not compel arbitration. *See* Opp'n at 6. Plaintiff contends because an arbitration provision is a separate agreement that survives the expiration or termination of the contract in which it is contained, the Court should only examine the parties' rights

and obligations under the Arbitration Clause, not the entire TOS, when determining whether Hatch Bank is a third-party beneficiary. *See Id.* Looking specifically at the Arbitration Clause, Plaintiff points out that Defendant's name is conspicuously absent. Thus, Defendant is unable to satisfy any of the requisite elements.

Wilson supports her contention for the Court to confine its analysis *solely* to the Arbitration Clause by citing *Buckeye Check Cashing, Inc. v. Cardegna* and *Rent-A-Ctr., W., Inc. v. Jackson*. 546 U.S. 440, 445 (2006); 561 U.S. 63, 70-71 (2010). However, this argument fails because, in both cases, the courts explained the doctrine of severability provides an arbitration provision survives the expiration or termination of an otherwise invalid contract in which it is contained and does not address whether a non-signatory can enforce an arbitration provision as a third-party beneficiary. *Buckeye*, 546 U.S. at 446; *Rent-A-Ctr.*, 561 U.S. at 70. Further, the California Supreme Court has instructed that when applying the *Goonewardene* test, a court may look to "the express provisions of the contract at issue, as well as all of the relevant circumstances under which the contract was agreed to." 6 Cal.5th at 830; *see also Eastern Aviation Grp., Inc. v. Airborne Express, Inc.*, 6 Cal.App.4th 1448, 1452 (1992) ("Whether the third party is an intended beneficiary . . . involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered").

Here, the TOS appears to contain language that could support a finding that the first[3] and second[4] elements of the *Goonewardene* Test were met. However, because

---

[3] A third party must "in fact benefit from the contract." *Goonewardene*, 6 Cal. 5th at 830. The plain language of Sections 1, ECF No. 7-4 at 2-3., and 3(b), *Id.* at 3., of the TOS unambiguously provides Hatch Bank received a loan application from Wilson, authorization to obtain Wilson's credit report, and assurances from Wilson to repay the loan, plus interest.

[4] For a third party to enforce a contract, "the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract." *Goonewardene*, 6 Cal. 5th at 830. Pursuant to Section 1 of the TOS, the purpose of the TOS is to provide consumer financing from Hatch Bank in exchange for a borrower's promise to repay the loan, plus a finance charge. ECF No. 7-4, at 2.

Hatch Bank cannot satisfy the test's third element, its assertion that it may enforce the Arbitration Agreement as a third-party beneficiary fails.

Permitting a third party to enforce arbitration against a contracting party must be consistent with the "objectives of the contract" and the "reasonable expectations of the contracting parties." *Goonewardene*, 6 Cal. 5th at 830. To make this determination, a court focuses on "the language of the contract and all of the relevant circumstances under which the contract was entered into" to determine whether "third party enforcement will effectuate the contracting parties' performance objectives, namely those objectives of the *enterprise* embodied in the contract, read in light of surrounding circumstances." *Id.* at 830–31.

Within the TOS, there are several instances where Defendant received rights and benefits—and was explicitly mentioned by name. *See generally* ECF No. 7-4 at 2-4. Specifically, Section 3(d) of the TOS states: "[Y]ou may be denied use of the Services by us or Hatch Bank for any reason permitted by applicable law, including, but not limited to, your creditworthiness, suspected fraud, your history of using the Services, or your violation of any agreement with us or Hatch Bank, including these Terms." *Id.* at 5. However, within the language of the Arbitration Clause, Hatch Bank's name is conspicuously absent: "In the interest of resolving disputes in the most expedient and cost-effective manner, you and Wisetack agree that every dispute arising in connection with these Terms or the Services will be resolved by binding arbitration, to the fullest extent permitted under applicable law." *Id.* "[A] third party beneficiary… can only enforce those promises made directly for his benefit." *Clark v. California Ins. Guar. Ass'n,* 200 Cal. App. 4th 391, 398 (2011) (citing *San Diego Housing Com'n v. Indust. Indem. Co.,* 95 Cal. App. 4th 669, 686 (2002)).

Hatch Bank's absence from the Arbitration Clause gives rise to a "compelling inference from this arrangement . . . [which supports the notion that] the parties knew how to give enforcement powers to non-signatories when they wished to" but chose not to do so here. *Ngo v. BMW of N. Am., LLC,* 23 F.4th 942, 948 (9th Cir. 2022).

Accordingly, permitting a third party to enforce arbitration would not be consistent with the objectives and reasonable expectations of the contract. Thus, the third element of the *Goonewardene* test is not satisfied.

In light of the circumstances under which the TOS was agreed to, the Court concludes Hatch Bank does not qualify as a third-party beneficiary and may not enforce arbitration under this theory.

### 2.    Equitable Estoppel

Under the theory of Equitable Estoppel, "'a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations.'" *Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.,* 186 Cal. App. 4th 696, 705 (2010). "'[A] party is 'not entitled to make use of [a contract containing an arbitration clause] as long as it worked to [their] advantage, then attempt to avoid its application in defining the forum in which [their] dispute . . . should be resolved.'" *Jensen v. U-Haul Co. of California*, 18 Cal. App. 5th 295, 306 (2017) (quoting *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 84 (2000)). The Ninth Circuit has held:

> [T]he doctrine of equitable estoppel applies when (1) a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and "the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement.

*Kramer*, 705 F.3d at 1128-29 (9th Cir. 2013) (internal quotation marks and citations omitted).

Wilson alleges no "concerted misconduct" between Wisetack and Hatch Bank; therefore, the second basis for equitable estoppel does not apply. *Id.* at 1128. Thus, the Court only needs to assess the first basis. *Id.* Because equitable estoppel applies only if Wilson's claims against Hatch Bank are dependent upon, or inextricably bound up with,

the obligations imposed by Wisetack's TOS, the Court must examine the facts alleged in the complaint. *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 229-30 (2009).

In her Complaint, Wilson asserts claims for negligence, breach of contract, breach of implied contract, invasion of privacy, violation of California's Unfair Competition Law, unjust enrichment, declaratory relief, and injunctive relief. Compl. ¶ 18. Wilson's claims are based on California common law and Hatch Bank's Privacy Policy, which "promises consumers that it will keep their Private Information private; comply with industry standards related to data security and the maintenance of their Private Information; inform them of its legal duties relating to data security and comply with all federal and state laws protecting their Private Information." *Id.* ¶ 28. Wilson argues her Complaint does not reference Wisetack, the Wisetack TOS, or Wisetack's Arbitration Clause. *See* Opp'n at 13. Moreover, The Agreements are independent of Hatch Bank's Privacy Policy, and because she does not take advantage of The Agreements' substantive terms, equitable estoppel does not apply. *Id.*

Hatch Bank contends equitable estoppel applies for two reasons. First, Wilson applied for a loan after receiving a link to the online application, hosted by Wisetack, from a merchant that invoiced Wilson for requested services—not through Hatch Bank's website. Gu Dec. ¶ 6. Therefore, the Privacy Policy contained on Hatch Bank's website cannot possibly support a claim for breach of contract here. Second, Hatch Bank had no prior business relationship with Wilson, and her claims arose from her Wisetack-facilitated loan application, which is governed by The Agreements. *See* Mot at 10. Hatch Bank's Privacy Notice is embedded within Wisetack's Privacy Policy—which Wilson accepted, along with the TOS and E-Sign Consent—therefore, Wilson's claims are founded in and are inextricably intertwined with the TOS. Thus, Hatch Bank may invoke the Arbitration Clause to compel Plaintiff to arbitrate her claims.

Examination of the Complaint shows Wilson bases her claims on Hatch Bank's Privacy Policy but failed to plead any facts substantiating how she initially came upon Hatch Bank's Privacy Policy. Pursuant to Carol Gu's declaration, the Court can

14

reasonably conclude that Plaintiff did not apply for a loan through Hatch Bank's website but instead "received a link [from a third-party merchant] to the online loan application hosted by Wisetack." *See* Gu Dec. ¶ 6.

"Under California law, parties may validly incorporate by reference into their contract the terms of another document." *Baker v. Aubry*, 216 Cal. App. 3d 1259, 1264 (1989). The doctrine of incorporation by reference "requires (1) the reference to another document was clear and unequivocal; (2) the reference was called to the attention of the other party, who consented to that term; and (3) the terms of the incorporated documents were known or easily available to the contracting parties." *Kleveland v. Chicago Title Ins. Co.*, 141 Cal. App. 4th 761, 765 (2006).

The Court will now turn to the contract language to conduct its analysis. First, the preamble of the TOS states:

> These General Terms of Service ("Terms") are a legally binding agreement between you ("you" or "User") and Wisetack, Inc., and our affiliates, agents, and assigns ("Wisetack," "we," or "us") regarding your use of Wisetack's services, including our platform, online services, and software applications (collectively, the "Service" or "Services"). Please read the Terms carefully. By using the Service you acknowledge that you have read, understood, and agree to be bound by the Terms, including the Wisetack Privacy Policy.

ECF No. 7-4 at 2. The words "Privacy Policy" are displayed in a blue font, indicating the existence of a hyperlink containing the contents of Wisetack's Privacy Policy. Second, Section 3(a)(d) of the TOS states: "You must be at least the age of majority in your state of residence to use the Service. By agreeing to these Terms, you represent and warrant to us that: you have read and agree to our Privacy Policy." *Id.* at 3. Third, Section 3(c) states:

> By using the Services, you authorize Wisetack, directly or through third parties, to make any inquiries we consider necessary to validate your creditworthiness, loan application, identity and to collect information about you in accordance with our Privacy Policy, and to comply with the Customer Identification Program (CIP) rules implementing Section 326 of the USA PATRIOT Act and our Privacy Policy.

1  | *Id.* Finally, Wisetack's Privacy Policy contains the following:

2

3  **WISETACK PRIVACY POLICY**

4  Last modified: June 29, 2022
Please save a copy: https://wisetack.us/#/privacy

5  We are committed to protecting your personal information. Please read this Privacy Policy carefully, as it describes the
ways Wisetack, Inc. and our affiliates and subsidiaries (collectively, "Wisetack" "we" or "us") use, store, disclose, and

6  protect personal information that we collect about you through any of our websites or mobile applications (collectively,
the "Services").

7  ### ONLINE PRIVACY POLICY

8  **HOW WISETACK COLLECTS YOUR INFORMATION**

9  **Information Wisetack Collects from You**

10  When you use the Services, including our website or a merchant website or software that has integrated the Services, we
may collect the following types of information from you:

11  - Personal information: your name, your email address, your phone number, your date of birth, your social security
number, and your address. We may also ask for your driver's license, or other government identification to verify
your identity and protect against fraud.

12  - Financial information: your income, bank account information, including account and routing numbers, transaction
histories, and other bank account details, and debit card numbers.

13  - Other information that you may provide to us, including when you participate in surveys or fill out forms.

14  For individuals associated with merchants using the Services (including owners and employees), we may also collect
additional information from you, including ownership information, contact information, and tax identification

15  information. We may also collect information about you from third parties, including from our partners, as well as
from public websites and vendors. We use this information to onboard you and enable you and your customers to use
the Services.

16  **Information Wisetack Collects from Third Parties**

17  We may also obtain information about you from third parties such as credit bureaus, identity verification services, and
other risk management tools. You may also choose to provide us with access to certain personal information stored by

18  third parties. By associating an account managed by a third party with your Wisetack account and authorizing Wisetack
to have access to this information, you agree that Wisetack may collect, store and use this information in accordance
with this Privacy Policy.

19  **Information We Collect Through Cookies and Other Tracking Technologies**

20  When you use the Services, we and our third-party service providers may use cookies, web beacons, and other tracking
technologies to collect information about the computer, mobile phone or other devices you use to access the Services.
The information collected in this manner may include IP address, browser characteristics, device IDs and characteristics,

21  location, mobile network information, operating system version, language preferences, referring URLs, and information
about the usage of our Services and any other available usage information. By using the Services, you consent to the
placement of cookies, beacons, and other similar technology in your browser and on emails in accordance with this

22  Privacy Policy. We may use this information for several purposes, including but not limited to:

23  - Analytics: to understand how our Services are being used, track performance, and make improvements

- Fraud Prevention: to prevent fraud or abuse of the Services

24  ©2022 Wisetack, Inc.                    1                    Document ID: 711d8b3c-3b48-45d0-817a-8115b1a3e59d

25  Exhibit D                         Loan ID: 98a8f39d    Accepted: 2023-01-20 12:36:00
Page 8

26

27

28

23cv813-JES (MPP)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Hatch Bank Privacy Notice**                                                        Rev. 6/2019

| Facts | WHAT DOES HATCH BANK DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Account balances and payment history<br>• Credit history and credit scores<br>When you are no longer our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Hatch Bank chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Hatch Bank share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes— to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes— information about your transactions and experiences | No | We don't share |
| For our affiliates' everyday business purposes— information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call 760-736-2000 |
|---|---|

| What we do | |
|---|---|
| How does Hatch Bank protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |

©2022 Wisetack, Inc.

7

Exhibit D

Page 9

Document ID: 711d8b3c-3b48-45d0-817a-8115b1a3e59d
Loan ID: 98a8f39d    Accepted: 2023-01-20 12:36:00

23cv813-JES (MPP)

1

| How does Hatch Bank collect my personal information? | We collect your personal information, for example, when you<br>• Open an account or apply for a loan<br>• Provide employment information or show your driver's license<br>• Give us your income information<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
|---|---|
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• Sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• Affiliates from using your information to market to you<br>• Sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Hatch Bank does not share with our affiliates.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Hatch Bank does not share with nonaffiliates so they can market to you.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *Hatch Bank doesn't jointly market.* |

**Other important information**

**For Alaska, Illinois, Maryland and North Dakota Customers.** We will not share personal information with nonaffiliates either for them to market to you or for joint marketing – without your authorization.

**For California Customers.** We will not share personal information with nonaffiliates either for them to market to you or for joint marketing – without your authorization. We will also limit our sharing of personal information about you with our affiliates to comply with all California privacy laws that apply to us.

**For Massachusetts, Mississippi and New Jersey Customers.** We will not share personal information from deposit or share relationships with nonaffiliates either for them to market to you or for joint marketing – without your authorization.

**For Vermont Customers.** We will not share personal information with nonaffiliates for them to market to you without your authorization and we will not share personal information with affiliates or for joint marketing about your creditworthiness without your authorization.

©2022 Wisetack, Inc.                     8
                              Exhibit D
                              Page 10

Document ID: 711d8b3c-3b48-45d0-817a-8115b1a3e59d
Loan ID: 98a8f39d   Accepted: 2023-01-20 12:36:00

ECF No. 7-6 at 2-4. [5]

---

[5] It should be noted that the content contained in pages 2-6 of the Privacy Policy were omitted from Exhibit D of Defendant's Motions. *See* ECF No. 7-6.

23cv813-JES (MPP)

From the plain language of the contract cited above, it is apparent that the references to Wisetack's Privacy Policy: (1) were clear and unequivocal, (2) were called to Plaintiff's attention, and (3) because a hyperlink to Wisetack's Privacy Policy was conspicuously embedded into the TOS, Wisetack's Privacy Policy was known or readily available to Plaintiff. Therefore, the *Kleveland* elements are satisfied, and the Court finds that Wisetack's Privacy Policy was validly incorporated by reference into the TOS.

As a result, the Court also finds that Plaintiff's loan application is governed by Wisetack's TOS and Privacy Policy. Prior to applying for a loan, a business relationship between Wilson and Hatch Bank did not exist. The TOS set forth that Plaintiff agreed to provide Wisetack and Hatch Bank her sensitive personal information for the purpose of processing a loan application. Wisetack's Privacy Policy sets forth how Plaintiff's personal data will be handled and protected by Wisetack. As indicated above, Wisetack's Privacy Policy contains not only its Privacy Policy—but also Hatch Bank's—which Plaintiff relies on to assert many of her claims.

If not for the TOS, Hatch Bank would have never been able to possess, let alone control, how Plaintiff's personal information would be handled. Further, because Wisetack's Privacy Policy, which contains Hatch Bank's Privacy Policy, was incorporated by reference into the TOS, the Court finds Plaintiff not only relied on the terms of the written agreement in asserting her claims against Defendant but also her claims are "intimately founded in and intertwined with" the underlying contract. Therefore, the doctrine of equitable estoppel applies.

Having found Hatch Bank may enforce Wisetack's Arbitration Agreement as a non-signatory party, the Court now turns to whether the question of arbitrability should be delegated to the arbitrator.

////

////

////

////

23cv813-JES (MPP)

**C.**     **The Question of Arbitrability has been Delegated to the Arbitrator, and the Arbitration Agreement is Valid**

**1.     Arbitrability**

Generally, a court must determine two gateway issues when deciding whether to compel arbitration: (1) whether there is an agreement to arbitrate between the parties, and (2) whether the agreement covers the dispute. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). "However, these gateway issues can be expressly delegated to the arbitrator where 'the parties clearly and unmistakably provide otherwise.'" *Id.* (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The Ninth Circuit has held that the incorporation of the American Arbitration Association ("AAA") Rules into an arbitration agreement "constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Id.* There is a split within the Ninth Circuit as to whether *Brennan*'s scope is limited to delegation clauses in cases involving sophisticated parties. However, in dicta, the *Brennan* court noted that there is no requirement for the parties to be sophisticated before a court may make such a finding. *Id.* at 1130-31. Because Wilson has offered no evidence or raised any arguments concerning her sophistication, or lack thereof, the Court will not consider the parties' sophistication in its analysis.

Here, the pertinent portion of Wisetack's Delegation Clause states:

> [A]ny arbitration related to these Terms or the Service will be settled under the Federal Arbitration Act, and governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by these Terms, and will be administered by the AAA.

ECF No. 7-4 at 5. This provision indicates that the American Arbitration Association Rules were incorporated to govern any arbitration related to the TOS. Following the guidance of the Ninth Circuit, incorporation of the AAA rules constitutes clear and unmistakable evidence that Wilson and Wisetack intended to delegate arbitrability. The Court, therefore, makes such a finding.

## 2. Validity

Wilson asserts Wisetack's Arbitration Clause, including the delegation clause therein, is unconscionable and should, therefore, be deemed invalid. Under California law, a contract may be found to be unconscionable if it is "so one-sided as to shock the conscience." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016). "Unconscionability has both a procedural and a substantive element." *A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 486 (1982). Procedural unconscionability focuses on oppression or surprise due to the disparate bargaining power of the parties. *Id.* at 486-487. In contrast, substantive unconscionability focuses on overly harsh or one-sided results. *Id.* Procedural and substantive unconscionability "must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." *Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 1533 (1997). Courts measure substantive and procedural unconscionability on a "sliding scale," "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). Courts, however, may not apply unconscionability principles in a way that undermines the objective of the FAA: "to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 563 U.S. at 344. Courts should instead give "due regard to the federal policy in favor of arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).

### a. Procedural unconscionability

To determine if an "arbitration agreement is procedurally unconscionable, the court must examine 'the manner in which the contract was negotiated and the circumstances of the parties at that time.'" *Ingle v. Cir. City Stores*, 328 F.3d 1165, 1171 (9th Cir. 2003) (quoting *Kinney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329 (1999)). Procedural unconscionability is generally presented in the form of a contract of adhesion,

"a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 88 (2003).

"[T]he California Supreme Court has not adopted a rule that an adhesion contract is per se unconscionable." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017). Instead, such a contract can only be deemed unenforceable if it is also substantively unreasonable. *Gutierrez*, 114 Cal. App. 4th at 88. "A contract is oppressive if an inequality of bargaining power between the parties precludes the weaker party from enjoying a meaningful opportunity to negotiate and choose the terms of the contract." *Id.* (citing *Stirlen*, 51 Cal. App. 4th at 1532). "Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (internal quotation marks omitted).

Wilson contends Wisetack's Arbitration Clause and Delegation Clause is a standard form, prepared by Wisetack, and presented to her as a condition of using its services–without an opportunity to negotiate terms. Therefore, they should both be considered contracts of adhesion. Further, she argues that due to its ambiguity and the fact that she was required to accept the terms on a take-it-or-leave-it basis, she was deprived of a reasonable opportunity to understand its terms and the chance to make a meaningful choice. Moreover, there was no apparent opportunity to opt out of the Wisetack Arbitration Clause, which further supports Wilson's position that both clauses are procedurally unconscionable. Finally, Wisetack's Arbitration or Delegation Clause fails to reference any modification of the AAA rules such that a third party, who is not expressly identified in the Arbitration Clause, may invoke the agreement.

Hatch Bank fails to raise arguments that dispute whether its Arbitration and Delegation Clauses are oppressive and should be considered contracts of adhesion. However, it states that if such a finding is made, only a minimal degree of procedural unconscionability would be established. Reply at 4. Hatch Bank also counters that

23cv813-JES (MPP)

Plaintiff cannot claim surprise because the preamble of the TOS put Wilson on notice that all disputes with respect to her use of the service would be resolved by binding arbitration. Moreover, Hatch Bank is identified by name throughout the TOS, and the key terms of the Arbitration Agreement are printed in upper case font.

The Court agrees with Wilson that Wisetack had greater bargaining power as a sophisticated corporation and did not offer customers, such as Wilson, an opportunity to negotiate the terms of the TOS. Instead, it presented Wilson with standardized contracts, which it had prepared.

However, the preamble of the TOS unambiguously provides Plaintiff adequate notice that all disputes with respect to her use of the service will be resolved by binding arbitration. Moreover, the arbitration provisions in the TOS are not hidden but consist of seven paragraphs, each with a bold typeface heading that describes the substance of the paragraph. Most of the arbitration provisions are in the same typeface and font size as the rest of the TOS, with the exception of the Arbitration Agreement's key terms, which are even more highlighted in upper case font. Further, arbitration itself is a customary means of dispute resolution and would not be "beyond the reasonable expectation of the weaker party." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1327 (2005). Additionally, there is no evidence that Wilson was not given ample time to read and understand the terms of the TOS before agreeing to them. It is reasonable to conclude that she had the time and resources, if she so wished, to conduct research, seek the advice of an independent legal professional, or consider alternatives. Thus, the Court finds the element of surprise is not present in Wisetack's Arbitration and Delegation Clauses.

Thus, while Wilson stood in a position of lower sophistication and bargaining power, the arbitration provisions are not hidden in a prolix form and Wilson had alternatives to secure financial services other than applying for a loan from Hatch Bank. Considered as a whole, the elements supporting and contrary to a finding of procedural unconscionability result balance out to a low degree of procedural unconscionability in Wisetack's Arbitration and Delegation Clauses.

**b.    Substantive unconscionability**

"Substantive unconscionability addresses the fairness of the term in dispute." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 997 (2010) (quoting *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (2002). "A provision is substantively unconscionable if it involves contract terms that are so one-sided as to shock the conscience or impose harsh or oppressive terms." *Parada v. Superior Ct.*, 176 Cal. App. 4th 1554, 1573 (2009) (quoting *Morris*, 128 Cal. App. 4th at 1322) (internal quotation marks omitted). "Thus, mutuality is the 'paramount' consideration when assessing substantive unconscionability." *Pokorny*, 601 F.3d at 997–98 (quoting *Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 657 (2004)). Within the context of an arbitration agreement, "it is unfairly one-sided for [a party] with superior bargaining power to impose arbitration on the [other party] as plaintiff but not to accept such limitations when it seeks to prosecute a claim against [that party], without at least some reasonable justification for such one-sidedness." *Armendariz*, 24 Cal. 4th at 117.

Wilson argues that Wisetack's Arbitration Clause is substantively unconscionable because it was outside her reasonable expectations that the Arbitration Clause would apply to claims against Hatch Bank. Additionally, the Delegation Clause makes no reference whatsoever to Hatch Bank. The failure to include Hatch Bank within the definition of the parties bound to the Arbitration Clause renders its terms unreasonably adverse. Thus, the terms of Wisetack's Arbitration and Delegation Clauses are unfairly one-sided and overly harsh to Wilson and, therefore, should be considered substantially unconscionable.

Wilson's arguments focus on the effect of Hatch Bank invoking the doctrine of equitable estoppel to enforce Wisetack's Arbitration Clause—rather than any one-sided terms in the arbitration provisions that shock the conscious. Turning again to the Arbitration Clause, "you and Wisetack agree that every dispute arising in connection with these Terms or the Services will be resolved by binding arbitration . . . . YOU UNDERSTAND AND AGREE THAT, BY USING THE SERVICES, YOU AND

23cv813-JES (MPP)

WISETACK ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY." This language is clear evidence of the presence of mutuality in the contested clause. As a result, the Court finds Wilson has failed to establish that Wisetack's Arbitration and Delegation clauses are substantively unconscionable.

In sum, the Court found above that Wisetack's Arbitration and Delegation Agreements contained a minimal degree of procedural unconscionability. However, considering the absence of any substantive unconscionability, Wilson's unconscionability argument fails.

Accordingly, the Court **GRANTS** Hatch Bank's Motion to Compel Arbitration.

**D.    This Matter Should be Dismissed.**

Having determined that the Arbitration Agreement is enforceable, the Court must decide whether to stay or dismiss this action. *See* Mot. at 19-20. "[A] district court may either stay the action or dismiss it outright when, as here, the court determines that all of the claims raised in the action are subject to arbitration." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014).

Hatch Bank contends that all claims in Wilson's Complaint are covered by an enforceable Arbitration Agreement and expresses a preference for dismissal over a stay. *Mot.* at 16; *id.* at 19-20. Whereas Wilson did not address these alternatives, *see generally* Opp'n, she therefore has waived any challenge to dismissal. *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (noting that "plaintiffs did not raise that argument to the district court in their . . . opposition to the defendants' motion for summary judgment, so the argument was waived."); *see also* S.D. Cal. CivLR 7.1. Accordingly, the Court **DISMISSES** this action **WITHOUT PREJUDICE**.

////
////
////
////
////

23cv813-JES (MPP)

# IV.    CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED:

    (1)    Defendant's Motion to Compel Arbitration is **GRANTED.**

    (2)    The case is **DISMISSED WITHOUT PREJUDICE.**

    (3)    The Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated:  March 29, 2024

Honorable James E. Simmons Jr.
United States District Judge

26

23cv813-JES (MPP)